H. Fort Flowers, et al. [1] v. Commissioner. Flowers v. Commissioner
Docket Nos. 89361, 89457-89461.
United States Tax Court
T.C. Memo 1963-27; 1963 Tax Ct. Memo LEXIS 316; 22 T.C.M. (CCH) 106; T.C.M. (RIA) 63027; January 30, 1963
*316 H. Fort Flowers, pro se, 3023 Del Monte Dr., Houston, Tex. John D. Laflin, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in gift tax of petitioners for the years and in the amounts as follows: Docket
Defi-
No.
Year
ciency
H. Fort Flowers
89361
1958
$35,550.00
Daniel F. Flowers
89457
1957
6,369.08
Barbara Flowers Murray
89458
1957
1,843.37
Sara Flowers Paschall
89459
1957
1,842.77
James Harlan Paschall
89460
1957
1,842.77
John Rylen Murray
89461
1957
1,843.37
The only issue is the fair market value of National Lime and Stone Company common stock on April 1, 1957, and on January 2, 1958. Findings of Fact The petitioners are H. Fort Flowers (hereinafter sometimes refered to as Flowers), Daniel F. Flowers (hereinafter sometimes referred to as Daniel), Barbara Flowers Murray (hereinafter sometimes referred to as Barbara), Sara Flowers Paschall (hereinafter sometimes referred to as Sara), James Harlan Paschall (hereinafter sometimes referred to as James), and John Rylen Murray (hereinafter sometimes referred to as John). All of the petitioners *317 reside in Houston, Texas. Gift tax returns for the year 1957 were filed by Daniel, Barbara, Sara, James and John. A gift tax return for the year 1958 was filed by Flowers. all gift tax returns were filed with the district director of internal revenue, Austin, Texas. Flowers is the father of Daniel, Barbara and Sara and the father-in-law of James and John. On April 1, 1957, Daniel Barbara, John, Sara and James made taxable gifts in trust of certain assets including 1,000 shares each of the no par common stock of the National Lime and Stone Company of Findlay, Ohio (hereinafter referred to as National). On January 2, 1958, Flowers made a taxable gift in trust of certain assets including 5,000 shares of National stock. In their gift tax returns, petitioners valued the stock of National at $50 per share. In the notice of deficiency to each petitioner, respondent determined that National's stock had a fair market value of $80 a share on the dates of the respective gifts. National was organized in 1902 and had its principal office in Findlay, Ohio. National manufacturers, mines and produces lime and lime products, limestone and readymix concrete. On April 1, 1957, and January 2, 1958, National *318 had two producing lime plants, which were located at Carey, Ohio. National also had from nine to ten operating stone plants located at Carey, Spore, Rimer, Findlay, Lima, East Liberty, Bucklan and Marion, Ohio, and had three producing ready-mix concrete plants which were located at Findlay, Lima and Marion, Ohio. On January 2, 1958, and for a period of at least nine years prior thereto, National had one class of authorized and outstanding stock. The authorized capital stock consisted of 100,000 shares of no par common stock. National's stock is not listed on any stock exchange. National's accounting year ends on the last day of November. The net earnings of National for the fiscal years ended November 30, 1949, through November 30, 1958, were: Fiscal Year
Net
Per
Ended 11-30
Earnings
Share
1949
$ 595,074.36
$ 6.96
1950
609,378.45
7.12
1951
481,994.22
5.63
1952
1,027,222.49
12.01
1953
1,157,274.00
13.28
1954
872,484.00
10.00
1955
1,162,352.00
13.32
1956
1,421,493.00
16.29
1957
1,268,292.00
14.54
1958
1,012,163.00
11.51
The board of directors of National declared and paid the following dividends during the fiscal years ended *319 November 30, 1950, through November 30, 1958: Fiscal Year
Dividends
Dividends
Ended 11-30
Paid
per Share
1950
$171,120
$2.00
1951
171,120
2.00
1952
213,900
2.50
1953
304,042
3.50
1954
305,400
3.50
1955
436,285
5.00
1956
$523,542
$6.00
1957
523,542
6.00
1958
526,192
6.00
The book value per share of National for the ten-year period ending November 30, 1958, was: Fiscal Year
Stockholders'
Book Value
Ended 11-30
Equity
Per Share
1949
$3,055,943.34
$35.72
1950
3,494,201.79
40.84
1951
3,805,076.01
44.47
1952
4,618,398.50
53.98
1953
5,526,597.00
63.34
1954
6,093,681.00
69.84
1955
6,819,748.00
78.16
1956
7,717,699.00
88.45
1957
8,245,978.00
94.50
1958
8,768,804.00
99.75
The working capital of National for the ten-year period ended November 30, 1958, was: Fiscal Year
Current
Less Current
Net Working
Ended 11-30
Assets
Liabilities
Capital
Ratio
1949
$1,472,914.56
$ 352,081.56
$1,120,833.00
4.18 to 1
1950
1,719,047.34
334,979.66
1,384,067.68
5.13 to 1
1951
1,727,477.91
475,529.24
1,251,948.67
3.63 to 1
1952
2,479,929.75
511,914.96
1,968,014.79
4.84 to 1
1953
2,471,832.00
591,535.00
1,880,297.00
4.2 to 1
1954
2,894,820.00
518,783.00
2,376,037.00
5.6 to 1
1955
3,338,055.00
583,826.00
2,754,229.00
5.7 to 1
1956
4,376,384.00
1,447,130.00
2,929,254.00
3.0 to 1
1957
2,802,282.00
1,219,671.00
1,582,611.00
2.3 to 1
1958
4,204,548.00
1,053,995.00
3,150,553.00
4.0 to 1
*320 The per share value of net liquid assets which consists of net current assets plus investments in Government securities of National were: Current Assets
Investment in
Fiscal Year
Less Current
U.S. Gov't.
Per
Ended 11-30
Liabilities
Securities
Total
Share Value
1950
$1,384,067.68
$ 507,560
$1,891,627.68
$22.11
1951
1,251,948.67
665,410
1,917,358.67
22.41
1952
1,968,014.79
656,610
2,624,624.79
30.67
1953
1,880,297.00
1,568,607
3,448,904.00
39.53
1954
2,376,037.00
1,591,501
3,967,538.00
45.47
1955
2,754,229.00
1,849,241
4,603,470.00
52.76
1956
2,929,254.00
2,335,260
5,264,514.00
60.33
1957
1,582,611.00
3,501,500
5,084,111.00
58.27
1958
3,150,553.00
2,303,531
5,454,084.00
62.04
The following schedule shows the total cash and Government securities owned by National on the respective dates: Fiscal Year
Government
Ended 11-30
Cash
Securities [2]
1950
$1,016,034.58
$ 535,762.21
1951
927,224.92
792,306.19
1952
$1,178,445.14
$1,237,166.50
1953
1,321,904.00
2,003,066.00
1954
1,654,645.00
2,157,117.00
1955
2,376,091.00
1,990,381.00
1956
2,454,408.00
3,275,058.00
1957
1,419,457.00
3,942,359.00
1958
1,784,560.00
3,494,390.00
*321 The source and application of funds statements of National for the fiscal years ended November 30, 1950, through November 30, 1958, show that funds were applied for additions to property, plant and equipment as follows: Funds
Fiscal Year
expended for
Cumulative
Ended 11-30
Capital Additions
Total
1950
$ 296,261.16
$ 296,261.16
1951
516,443.53
812,704.69
1952
418,697.35
1,231,402.04
1953
377,875.00
1,609,277.04
1954
317,348.00
1,926,625.04
1955
496,199.00
2,422,824.04
1956
668,035.00
3,090,859.04
1957
$1,041,041.00
$4,131,900.04
1958
621,053.00
4,752,953.04
The land account of National increased from *322 a gross book value on November 30, 1950, of $454,196.14 to $906,705 on November 30, 1957. The net book value of plant and equipment and the insurance (fire and extended coverage) carried thereon by National during the years ended November 30, 1950 through 1958, were: Net Book
Excess of
Fiscal Year
Value Plant
Insurance
Coverage over
Ended 11-30
& Equipment
Coverage [3]
Book Value
1950
$1,295,794
$2,974,000
$1,678,206
1951
1,585,994
3,125,490
1,539,496
1952
1,661,293
3,367,550
1,706,257
1953
1,672,070
3,397,670
1,725,600
1954
1,592,071
3,679,200
2,087,129
1955
1,768,308
3,869,200
2,100,892
1956
1,985,667
4,184,310
2,198,643
1957
2,536,083
4,346,410
1,810,327
1958
2,640,753
4,929,210
2,288,457
The following schedule indicates the number of National shares that were issued and outstanding on the respective dates: Number of Shares
Dates
Issued and Outstanding
November 30, 1949 to November 30, 1952
85,560
November 30, 1953 to November 30, 1957
87,257
November 30, 1958
87,907 The increase *323 of 1,697 shares of National stock issued and outstanding between November 30, 1952, and November 30, 1953, was due to the issuance of stock to four employees under a stock purchase plan on May 23, 1953 (hereinafter sometimes referred to as the 1953 Plan). The increase of 650 shares of National stock issued and outstanding between November 30, 1957, and November 30, 1958, was due to the issuance of stock to new employees under a stock purchase agreement. Under the terms of the 1953 Plan, the four designated employees had the right to purchase a specified number of shares of National Stock at 60 percent of book value. The terms of the 1953 Plan provided that the employees exercising the options were required at the time of termination of their employment, either voluntary or involuntary, or in the event of their death, to sell the purchased stock to National or certain stockholders at 60 percent of the book value as shown by the company's financial statements for the fiscal year immediately preceding the date of repurchase. Flowers and Daniel were both directors of National. Case No. 29860 was instituted by them in the Court of Common Pleas of Hancock County, Ohio, captioned "H. *324 Fort Flowers, et al., v. National Lime and Stone Company, an Ohio Corporation, et al.," to enjoin or cancel the stock issued to the four employees under the 1953 Plan. This action was part of a series of suits between the majority and minority shareholders of National. Case No. 28078 had previously been instituted in the same Common Pleas Court to set aside the issuance of certain shares which were freed from pre-emptive rights in 1945. Subsequently, Case No. 29853 was filed in 1953 on the same 1945 cause setting forth newly-discovered grounds for fraud. In Case No. 29860, Flowers testified under oath that in his opinion the fair market value of National stock on November 30, 1952, was $117.77 per share based on reproduction cost; $128.83 per share based on capitalization of earnings at six percent over a period of eight years; and approximately $200 per share based on capitalization of 1952 earnings at six percent. It was also Flowers' opinion in that case that the book value of the National stock on November 30, 1952, did not represent the full value of the stock on that date. The decision of the Court of Common Pleas was that there was nothing unfair in the sales price to the *325 employees at 60 percent of book value since "the only benefit that the employee will ultimately receive will be the increase in value, as he must sell on the same formula that he purchased * * *." On November 23, 1953, Flowers wrote a letter to the First Presbyterian Church of Findlay, Ohio. In the letter he stated that he was giving the church 200 shares of National stock having a fair market value of $50 per share. On November 25, 1953, the church, in turn, sold the stock to Differential Steel Car Company (hereinafter referred to as Steel Car) for $50 per share. At that time, Flowers owned approximately 79 percent of the shares of Steel Car. On or about December 31, 1957, Steel Car transferred the 200 shares of National stock to H. L. Simpson (hereinafter referred to as Simpson), a broker associated with Underwood Neuhaus & Co., Houston, Texas, for $50 per share. Simpson was a family friend of Flowers. On January 20, 1958, Daniel acquired 100 of the shares and on January 27, 1958, Fred Flowers (hereinafter referred to as Fred) acquired the other 100 shares from Simpson. The price paid to Simpson was $50 per share. Fred is also one of Flowers' sons. Opinion The sole issue is *326 what the fair market value of the National stock was on April 1, 1957, and on January 2, 1958. The burden of proof is upon petitioners to show by a preponderance of the evidence that the fair market value of the National stock was less than $80 per share, as determined by the Commissioner, on the dates of the gifts. Petitioners have failed to sustain this burden. Indeed, the evidence affirmatively establishes that the National stock had a fair market value of at least $80 per share on the dates of the gifts. Aside from its other assets, the company's liquidity was such that it could pay all its debts and have cash and Government bonds in excess of $50 per share. There is no evidence to support petitioners' contention that the value of National's assets were inflated. The basis of this contention seems to be unsettled income taxes from 1950 to 1958. The evidence shows that the taxes for the years 1950 through 1954 were paid and the company is seeking a refund. The amount of taxes involved was approximately $300,000. As to later years, there is no evidence that the company has been audited, much less that there is any contingent liability. Certainly, petitioners' reliance on a *327 few isolated sales by the Presbyterian Church to Flowers' controlled corporation or by that corporation to a friend of the family and a transfer within a month back to members of the family is misplaced. Even if we found that these were arm's-length sales (which we do not), we think they are insufficient to establish a market. As for the sales to the employees under the stock options, we find it difficult to see how this could establish a fair market value. Firstly, such stock is restricted as to its sale. Secondly, even if this did represent the fair market value, the sales in 1953 are tooremote. Decisions will be entered for the respondent. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Daniel F. Flowers, Docket No. 89457; Barbara Flowers Murray, Docket No. 89458; Sara Flowers Paschall, Docket No. 89459; James Harlan Paschall, Docket No. 89460; and John Rylen Murray, Docket No. 89461.↩
2. In the balance sheets for the respective years, government securities were segregated into two groups. Part of these securities were included under the caption "Current Assets" and part were included under the caption "Other Assets." The amounts shown in this schedule represent the total amount included under both captions. In the immediately preceding schedule, the amounts shown under the caption "Investment in U.S. Gov't. Securities" represents only the amounts shown in the balance sheets under the caption "Other Assets."↩
3. 90 percent co-insurance clause. Insurance coverage presented excludes boiler and air tank coverage.↩